```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :    SEALED INDICTMENT

       - v. -                       :    S1 09 Cr. 110

DAVID EDUARDO HELMUT MURCIA GUZMÁN,  :
MARGARITA LEONOR PABON CASTRO,
     a/k/a "Margarita Castro Pabon," :
WILLIAM SUÁREZ-SUÁREZ,
DANIEL ANGEL RUEDA,                  :
LUIS FERNANDO CEDIEL ROZO,
     a/k/a "Luis Fernando Sudiel Rosso,":
SANTIAGO BARANCHUK-RUEDA,
     a/k/a "Santiago Baranchuk,"     :
     a/k/a "Santiago Rueda," and
GERMAN ENRIQUE SERRANO-REYES,        :

                    Defendants.      :

- - - - - - - - - - - - - - - - - - - X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 1 7 2009

## COUNT ONE

1.   From in or about October 2007, up to and including in or about November 2008, in the Southern District of New York and elsewhere, DAVID EDUARDO HELMUT MURCIA GUZMÁN, MARGARITA LEONOR PABON CASTRO, a/k/a "Margarita Castro Pabon," WILLIAM SUÁREZ-SUÁREZ, DANIEL ANGEL RUEDA, LUIS FERNANDO CEDIEL ROZO, a/k/a "Luis Fernando Sudiel Rosso," SANTIAGO BARANCHUK-RUEDA, a/k/a "Santiago Baranchuk," a/k/a "Santiago Rueda," and GERMAN ENRIQUE SERRANO-REYES, the defendants, and others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B).

2.   It was a part and an object of the conspiracy that DAVID EDUARDO HELMUT MURCIA GUZMÁN, MARGARITA LEONOR PABON CASTRO, a/k/a "Margarita Castro Pabon," WILLIAM SUÁREZ-SUÁREZ, DANIEL ANGEL RUEDA, LUIS FERNANDO CEDIEL ROZO, a/k/a "Luis Fernando Sudiel Rosso," SANTIAGO BARANCHUK-RUEDA, a/k/a "Santiago Baranchuk," a/k/a "Santiago Rueda," and GERMAN ENRIQUE SERRANO-REYES, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the transfers of millions of dollars by wire, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, illegal narcotics transactions, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

### MEANS AND METHODS OF THE MONEY LAUNDERING CONSPIRACY

3.   Among the means and methods by which DAVID EDUARDO HELMUT MURCIA GUZMÁN, MARGARITA LEONOR PABON CASTRO, a/k/a "Margarita Castro Pabon," WILLIAM SUÁREZ-SUÁREZ, DANIEL ANGEL RUEDA, LUIS FERNANDO CEDIEL ROZO, a/k/a "Luis Fernando Sudiel

2

Rosso," SANTIAGO BARANCHUK-RUEDA, a/k/a "Santiago Baranchuk," a/k/a "Santiago Rueda," and GERMAN ENRIQUE SERRANO-REYES, the defendants, and others known and unknown, would and did carry out the money laundering conspiracy were the following:

### THE DMG ORGANIZATION

a. Beginning in or about 2003, DAVID EDUARDO HELMUT MURCIA GUZMÁN, the defendant, and others known and unknown, created an entity called DMG (MURCIA GUZMÁN's initials) as a vehicle for a multi-level marketing scheme. Over the years, MURCIA GUZMÁN, along with others known and unknown, established hundreds of subsidiary and affiliated companies linked to DMG (collectively "DMG" or the "DMG Group") that were located in countries including Colombia, Panama, and the United States.

b. DMG purported to operate as follows: prepaid debit cards were sold to customers in Latin America, who also acted as affiliate salespeople for DMG. DMG's customers could use the debit cards to buy items, like electronics, at retail stores operated by DMG. If the customers signed up new customers, they could redeem points on different cards for cash. DMG received cash, in the form of Colombian pesos, from its customers in exchange for the prepaid debit cards.

c. In November 2008, MURCIA GUZMÁN, PABON CASTRO, and ANGEL RUEDA were arrested by Colombian law enforcement in connection with allegations of fraud by and

through DMG. In January 2009, DMG ceased operation. In mid-January 2009, SUÁREZ-SUÁREZ was arrested by Colombian law enforcement, also on allegations of fraud.

        d. PABON CASTRO, a personal friend of MURCIA GUZMÁN, was the legal advisor to DMG and sat on the board of several DMG Group companies. PABON CASTRO also assisted in accounting matters for DMG and in hiding information from Colombia's Superintendencia de Sociedades, an agency responsible for the regulation of corporations.

        e. SUÁREZ-SUÁREZ headed the Colombian operations of DMG, including the attempted bribery of Colombian officials.

        f. ANGEL RUEDA, a personal friend of MURCIA GUZMÁN, headed DMG's public relations department and coordinated DMG's purchase of properties in Colombia and abroad. BARANCHUK-RUEDA, a cousin of ANGEL RUEDA, worked primarily out of Mexico for DMG. CEDIEL ROZO, who is married to PABON CASTRO, also worked primarily out of Mexico for DMG.

        g. By virtue of the widespread success of the multi-level marketing scheme operated by DMG and its approximately 400,000 customers, DMG received large amounts of cash in the form of Colombian Pesos. Colombian law enforcement has made several large seizures of Colombian pesos belonging to DMG.

    h. For example, in or about August 2007, Colombian law enforcement seized Colombian pesos with a value of approximately US$3.3 million from a truck in the vicinity of Putumayo, Colombia. At the time of the seizure, SUÁREZ-SUÁREZ stated that the money belonged to DMG.

    i. In or about October 2007, in a telephone call recorded pursuant to a court order, Colombian law enforcement seized Colombian pesos with a value of approximately US$1 million from a hidden compartment within a tourist bus (the "Bus Seizure"). The interior of the bus tested positive for narcotics. On or about October 27, 2007, in a telephone call lawfully recorded pursuant to a court order, SUÁREZ-SUÁREZ talked with a co-conspirator not named as a defendant herein, and discussed the Bus Seizure and the bribing of Colombian police officers.

### THE BLACK MARKET PESO EXCHANGE

    j. The Black Market Peso Exchange ("BMPE") is one method used to launder drug money and evade the record-keeping and reporting requirements mandated by law, as well as Colombian foreign exchange and import laws and tariffs.

    k. The need to launder narcotics dollars arises out of the massive amounts of cash generated by sales of South American drugs -- mostly cocaine and heroin -- in the United States. These narcotics are sold in the United States for U.S.

5

dollars, almost always in cash, and often in small denominations. Reporting and record-keeping requirements mandated by statute and regulation prevent narcotics traffickers from simply depositing those funds into accounts in the United States and transferring them to Colombia or other countries, so narcotics traffickers must disguise, or "launder," the funds in order to hide their true source.

    1. The basic Colombian BMPE scheme operates as follows:  In Colombia, the owners of the narcotics proceeds generated in the United States, and often smuggled into Mexico, contact a third party -- generally referred to as a "peso broker" -- who agrees to provide Colombian pesos he controls in Colombia in exchange for the cash narcotics proceeds that the traffickers control in the United States.  A two-stage exchange is then arranged: [1] in the United States or Mexico, the traffickers' representatives transfer the cash narcotics proceeds -- often hundreds of thousands of U.S. dollars or more at a time -- to the broker's representatives; [2] in Colombia, the broker pays the narcotics traffickers the corresponding amount (less the broker's commission) in Colombian pesos.  Once this exchange occurs, the narcotics traffickers have effectively laundered their money. The peso broker must now do something with the U.S. dollars that he has obtained in the United States and/or Mexico so that he can obtain pesos to compensate for those he has paid out.  In other

words, the peso broker, who now has a pool of narcotics-derived funds in the United States and/or Mexico, must find persons or businesses willing to buy U.S. dollars for pesos.

        m.   Colombians who want to buy dollars and who have pesos to sell then make arrangements with the peso broker. A Colombian businessman who needs dollars to fund an offshore investment account, or to pay a U.S. company for goods or services imported into Colombia, for example, will go to a broker to buy dollars instead of to the legitimate, regulated Colombian banking system.  By doing so, the businessman can get better exchange rates than from the banks and can avoid Colombian currency transaction reporting requirements, and paying certain Colombian import and exchange tariffs.  Once the businessman pays the broker in pesos, the peso broker will direct that the dollars he has accumulated from the narcotics traffickers and put into the banking system be sent, usually by wire transfer, to wherever the businessman buying the dollars wants them transferred.

        n.   All three parties involved in the BMPE process thus benefit:  the narcotics traffickers receive laundered pesos; the Colombian businesspeople wishing to buy dollars convert their pesos without reporting or paying taxes and tariffs; and the peso broker makes his profits on the "spread" between the price that the broker buys and sells the dollars.

o.  The BMPE process may also involve more than one peso broker. One broker, for example, might have a direct relationship with the cocaine cartels in Colombia; another might have contacts in the United States who can accumulate narcotics proceeds; and yet a third might have contacts with businesspeople or other wealthy Colombians who want dollars and have pesos to sell. Irrespective of how many intermediaries there are, the result is the same: pesos in Colombia are used to buy narcotics proceeds in the form of U.S. dollars.

p.  The fact that the BMPE process almost invariably utilizes narcotics proceeds has been widely publicized in Colombia. Any party using BMPE brokers in Colombia thus knows or reasonably should know that there is a substantial likelihood that the dollars they receive as the result of their transactions with peso brokers are the proceeds of narcotics transactions.

### THE MERRILL LYNCH ACCOUNT

q.  With ample funds denominated in pesos from the success of its multi-level marketing scheme, DMG exploited the BMPE to its own benefit and to the benefit of Colombian narcotics traffickers, who had ample funds denominated in U.S. dollars.

r.  For example, in the fall of 2007, MURCIA GUZMÁN and PABON CASTRO approached another individual ("CS-1") in Colombia, and told CS-1 that they were in possession of large

8

quantities of cash -- apparently U.S. dollars -- which they could not deposit into the Colombian banking system. MURCIA GUZMÁN and PABON CASTRO requested that CS-1 set up an account in the United States into which they could deposit the funds.

      s.    On or about March 6, 2008, pursuant to the request made by MURCIA GUZMÁN and PABON CASTRO, CS-1 opened an investment account at Merrill Lynch (the "Merrill Lynch Account"). Upon the instructions of MURCIA GUZMÁN and PABON CASTRO, the Merrill Lynch Account was opened in the name "Blackstone International Development," and was not in the name of either MURCIA GUZMÁN or PABON CASTRO.

      t.    Between March 11, 2008 and May 9, 2008, via approximately eighteen wire transfers, US$2,188.727.86 was deposited into the Merrill Lynch Account.

      u.    In or about March 2008, MURCIA GUZMÁN and PABON CASTRO told CS-1 that they had provided an equivalent amount of Colombian Pesos to GERMAN SERRANO in Colombia, and, in exchange, GERMAN SERRANO had caused the nearly US$2.2 million to be wired into the Merrill Lynch Account.

      v.    In or about May 2008, pursuant to a court order, the United States Government seized the nearly US$2.2 million from the Merrill Lynch Account.

      w.    Soon thereafter, CS-1 contacted MURCIA GUZMÁN, and informed him of the seizure; CS-1 provided to MURCIA

GUZMÁN a copy of the judicial paperwork authorizing the seizure. In response, MURCIA GUZMÁN told CS-1, in sum and substance, that CS-1 should do nothing at all in response to the seizure, and that CS-1 should not worry about the approximately US$2.2 million that had been seized. MURCIA GUZMÁN also told CS-1 that CS-1 should, under no circumstances, inform the authorities of either MURCIA GUZMÁN's or PABON CASTRO's involvement with the Merrill Lynch Account.

   x. As of on or about February 5, 2009, the United States Government has received no claim for the return of the approximately US$2.2 million seized from the Merrill Lynch Account.

**THE COLLECTION OF NARCOTICS PROCEEDS IN MEXICO**

   y. Beginning in or about February 2008 - at approximately the same time MURCIA GUZMÁN and PABON CASTRO caused CS-1 to open the Merrill Lynch Account - ANGEL RUEDA, CEDIEL ROZO, and BARANCHUK-RUEDA collected millions of U.S. dollars in cash on the streets of Mexico City, Mexico, which were the proceeds of narcotics trafficking.

   z. Specifically, on or about February 9, 2008, in a telephone conversation recorded pursuant to a Colombian court order, BARANCHUK-RUEDA reported to ANGEL RUEDA that he had picked up US$1.4 million in U.S. currency in small denominations (the "US$1.4 Million"), and BARANCHUK-RUEDA told ANGEL RUEDA that

10

BARANCHUK-RUEDA was trying to get in touch with CEDIEL ROZO, the defendant, but that CEDIEL ROZO was not answering his telephone. ANGEL RUEDA responded that he would speak to PABON CASTRO to determine what BARANCHUK-RUEDA should do with the US$1.4 Million.

    aa.  On or about February 10, 2008, in a telephone conversation recorded pursuant to a Colombian court order, BARANCHUK-RUEDA told ANGEL RUEDA that BARANCHUK-RUEDA had a briefcase full of cash – "all tens and twenties" – in his Mexico City hotel room, and that he was concerned about being robbed. About ten minutes after that telephone call, ANGEL RUEDA talked with a co-conspirator not named as a defendant herein ("CC-1"), and asked CC-1 to call MURCIA GUZMÁN to find out what BARANCHUK-RUEDA should do with the US$1.4 Million.

    bb.  On or about February 19, 2008, in a telephone call lawfully recorded pursuant to a Colombian court order, BARANCHUK-RUEDA complained to ANGEL RUEDA that he was dissatisfied with the way the money pick-ups had proceeded in Mexico City: "We're talking about a million dollars.  If I'm caught on the street with [expletive] like that, I'll spend years in jail."  BARANCHUK-RUEDA asked ANGEL RUEDA whom the US$1.4 Million belonged to, and ANGEL RUEDA responded that it belonged to MURCIA GUZMÁN.

    cc.  On or about February 21, 2008, in a telephone call lawfully recorded pursuant to a Colombian court order,

11

BARANCHUK-RUEDA further explained to ANGEL RUEDA that, earlier that day, on a Mexico City street, a Colombian woman from Medellin had made a delivery of a million dollars in cash from her Land Rover. BARANCHUK-RUEDA repeated that "the risk I'm taking over here is really big."

## THE USE OF REAL PROPERTY IN
## THE UNITED STATES TO HIDE ILLICIT PROCEEDS

dd.  On or about April 5, 2008, in a telephone call lawfully recorded pursuant to a Colombian court order, BARANCHUK-RUEDA told ANGEL RUEDA that BARANCHUK-RUEDA was in Miami, Florida, and the two then discussed an imminent meeting with MURCIA GUZMÁN, in which BARANCHUK-RUEDA asked ANGEL RUEDA to tell MURCIA GUZMÁN that BARANCHUK-RUEDA needs to talk to MURCIA GUZMÁN about "how we can move what we have over here."

ee.  On or about April 22, 2008, in a telephone call lawfully recorded pursuant to a Colombian court order, ANGEL RUEDA told BARANCHUK-RUEDA to email to ANGEL RUEDA the account numbers and amounts of funds in certain accounts that BARANCHUK-RUEDA and PABON CASTRO had discussed.

ff.  Between in or about May 2008 and in or about June 2008, in telephone calls lawfully recorded pursuant to a Colombian court order, ANGEL RUEDA and BARANCHUK-RUEDA talked on several additional occasions, and discussed several real estate transactions in Miami, Florida. Further, ANGEL RUEDA and BARANCHUK-RUEDA discussed incorporating limited liability

corporations ("LLCs"), and using the names of BARANCHUK-RUEDA and a co-conspirator not named as a defendant herein, noting that it is "safer" to create LLCs in the United States using at least two partners. Subsequently, BARANCHUK-RUEDA told ANGEL RUEDA that purchasing properties is an advantageous way to hide the proceeds: "we can go out and purchase another twenty properties . . . without having to expose a single buck." In another conversation, ANGEL RUEDA and BARANCHUK-RUEDA discussed that PABON CASTRO would be traveling to the United States to establish more LLCs in BARANCHUK-RUEDA's name, and ANGEL RUEDA assured BARANCHUK-RUEDA that it will all be done "in a safe way."

## OVERT ACTS

4. In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. In or about October 2008, a co-conspirator not named as a defendant herein, on behalf of DMG, registered, with the New York Department of State, a Domestic Limited Liability Company with Active Charter Number 3737173 in the name of "DMG Group LLC," located at 445 Park Avenue, 9th Floor, New York, New York, 10022.

      b.    In or about March 2008, MURCIA GUZMÁN and PABON CASTRO caused an investment account to be opened in the name of "Blackstone International Development" at Merrill Lynch.

      c.    In or about June 2008, MURCIA GUZMÁN talked on the telephone with a co-conspirator not named as a defendant herein, and discussed the purchase and sale of properties in the United States.

      d.    In or about June 2008, ANGEL RUEDA and SUÁREZ-SUÁREZ talked on the telephone and discussed, in sum and substance, the consequences to DMG of an arrested narcotics trafficker talking to law enforcement authorities.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION

5.    As the result of committing the money laundering offense in violation of Title 18, United States Code, Section 1956, alleged in Count One of this Indictment, DAVID EDUARDO HELMUT MURCIA GUZMÁN, MARGARITA LEONOR PABON CASTRO, a/k/a "Margarita Castro Pabon," WILLIAM SUÁREZ-SUÁREZ, DANIEL ANGEL RUEDA, LUIS FERNANDO CEDIEL ROZO, a/k/a "Luis Fernando Sudiel Rosso," SANTIAGO BARANCHUK-RUEDA, a/k/a "Santiago Baranchuk," a/k/a "Santiago Rueda," and GERMAN ENRIQUE SERRANO-REYES, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offense and all

property traceable to such property, including but not limited to the following:

  a. At least approximately millions of dollars in United States currency, in that such sum in aggregate is property which was involved in the money laundering offense or is traceable to such property;

  b. The real property located at 175 SW 7th Street, #1810, Miami, Florida 33130;

  c. The real property located at 175 SW 7th Street, #1811, Miami, Florida 33130;

  d. The real property located at 175 SW 7th Street, #2008, Miami, Florida 33130;

  e. The real property located at 455 5th Avenue, Half Moon Bay, California 94019;

  f. The real property located at 90 Alton Road, #601, Miami, Florida 33139;

  g. The real property located at 20201 E. Country Club Drive, #902, Aventura, Florida 33180;

  h. The real property located at 951 Brickell Avenue, # 1906, Miami, Florida 33131;

  i. The real property located at 951 Brickell Avenue, #2006, Miami, Florida 33131;

  j. The real property located at 951 Brickell Avenue, #2304, Miami, Florida 33131; and

    k. The real property located at 880 Biscayne Boulevard, Unit 2507, Miami, Florida 33132.

### Substitute Asset Provision

    6. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

    (Title 18, United States Code, Sections 982 and 1956.)

_____
FOREPERSON

_____
LEV L. DASSIN
Acting United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

DAVID EDUARDO HELMUT MURCIA GUZMÁN,
MARGARITA LEONOR PABON CASTRO,
a/k/a "Margarita Castro Pabon,"
WILLIAM SUÁREZ-SUÁREZ,
DANIEL ANGEL RUEDA,
LUIS FERNANDO CEDIEL ROZO,
a/k/a "Luis Fernando Sudiel Rosso,"
SANTIAGO BARANCHUK-RUEDA,
a/k/a "Santiago Baranchuk,"
a/k/a "Santiago Rueda," and
GERMAN ENRIQUE SERRANO-REYES,

Defendants.

### SEALED INDICTMENT

S1 09 Cr. 110

(Title 18, United States Code,
Sections 1956 and 982.)

LEV L. DASSIN
Acting United States Attorney.

**A TRUE BILL**

_____
Foreperson.